Good morning, your honor. I'm William Broberg. I represent the defendant appellate Hung Van Nguyen today. For Mr. Nguyen and for myself, thank you very much for hearing me on his behalf today. The government has said that we've raised 12 issues and additional sub-issues. We've really only raised eight issues. Why don't you focus on your major issues? Obviously, one, of course, is sufficiency of the evidence in the three categories. And that's what I plan to do. And I will do that. What I think this – what screams out to me in this case is this man wanted that informant. He had a prior relationship with that informant. He wanted to put before the jury the context of that relationship. What the evidence – What the problem is that there was no proffer in terms of exactly what he would have done, I mean, what his story was. It's very, very vague in terms of how we can understand why any of this mattered. Well, I do think there was a proffer, your honor. The fact that there was a prior relationship was told to the judge, to the district judge by the attorney. The fact that Mr. Nguyen thought that this was his only chance to win. I mean, he said, without him, I'm mostly guilty. You know, he's saying that's what's going to happen. I need this witness. This isn't some character witness who's going to talk about, you know, my reputation in the community in my case. This is the guy who knows how this started. That knows – and remember, the evidence in this case is that he was approached by the informant. He was targeted by the informant. He wasn't targeted by the police. The police had no clue about Mr. Nguyen. Mr. Nguyen's from Portland. And so it was very, very important to have this person who could potentially contradict what the police were testifying. All right. Assuming all of that is true, from where we sit, we have to look at the record, your honor. And we have to ask the question, was there sufficient showing in the record as a whole to let it go to the jury? Absolutely. And the fact that Mr. Nguyen was not a witness may not be relevant to that inquiry at all? Right. When one looks at conspiracies charged in the indictment, for instance, and looks at the proof, what the government has said in their brief is that Mr. Nguyen was an agent for the informant. But he's also simultaneously a co-conspirator. And what is very confusing about this strange constellation of roles for Mr. Nguyen is we know that Escobar and Sears would prohibit criminal liability for any agreement, conspiratorial agreement, with the government informant, because that's a legal impossibility. But we have an acknowledgment from the government in this case that he was an agent for this informant. In all of the statements, all of the tape-recorded statements, there does seem to be some kind of agreement between Mr. Nguyen and this informant. He says, I mean, there is a bit of testimony. But there were more than two people involved in here. It wasn't just the 8-kilogram sale of cocaine to the confidential informant. It was the role that these other people played as well. Well, exactly, Your Honor. And I certainly think the government has proved a conspiracy with them. But the problem is, is Mr. Nguyen is a buyer. He's not a seller. And they're, to various degrees, sellers. You know, Xuan Nguyen, if I'm saying the first name correctly, who's no relation to Hung Nguyen, who is a co-conspirator who testified, said, I've never seen this guy before in my life. He's a friend of another co-conspirator, B. Lee, who he's like a hangout at B. Lee's house, you know, we're friends, and he talked about other people who were B. Lee's friends. He's never seen this guy before in his life. The people who were indisputably co-conspirators, they didn't let Mr. Nguyen near that cocaine, touch that cocaine. I mean, there's this very weird thing where the sample is Dr. Vu takes the sample, gives it to B. Lee, gives it to Mr. Nguyen. I mean, he is he's not privy to their agreement. And, indeed, he has a different purpose. He's seen by them as a buyer. They're seen by him as a seller. I mean, he sees them as sellers. He's not privy to their overall agreement, because their agreement actually is much bigger than this one sale. It seems, I mean, another way of characterizing what he is, is a middle person, a middle man. I mean, he's essentially buying from one person. He's facilitating the sale from one person, from the conspiracy, to this other person. And why he has to have why, for the purpose of a conspiracy law, he has to be put into some pigeonhole, I'm not sure. I think that is a point, Your Honor. I think his role is slightly more complicated than middle man, because he's directed by this informant. I mean, many, many times, and I sampled some of it in short portions in my reply brief, this guy's like, I don't want to do this. I'm just doing this because we're friends. If you're scared, I don't want to do it. But he never actually makes an entrapment defense. So, again, on the record before us, that's kind of off the table. Well, he doesn't make it. But, you know, go all the way back to the Roviero case. And the Roviero case is about getting the identity of an informant, right? But what's so important about that identity of that informant? And in that case, it was a person named John Doe, you know, because the actual identity was never given up. It says Petitioner's opportunity to cross-examine Police Officer Bryson and Federal Narcotics Agent Durham was hardly a substitute for an opportunity to examine the man who had been nearest to him and took part in the transaction. Doe had helped to set up the criminal occurrence and had played a prominent part in it. His testimony was the same. All right. But there are all these sort of disturbing pieces, but no legal theory that's very well attached to them, because in terms of the non-appearance of the confidential informant, which is, I guess, what you're referring to now, there was never any attempt to demonstrate that the government hadn't sufficiently tried to find him. I mean, that may be an ineffective assistance of counsel issue here down the line, no. 2255, but at this point, there's no demonstration that he was not genuinely unavailable or not findable. Your Honor, if I could just read this last clause just to put this case down. But then it says, the Supreme Court says, this person's testimony might have disclosed an entrapment. And that's why these people are so important, is because they have things that aren't on tapes. They don't have to. I understand that, but he wasn't – that's why I stopped you. But he wasn't found. And unless you can demonstrate that there was something wrong with that, what difference does it make? Well, the government did make the representation that they were trying to find him. You know, a confidential informant stands in special shoes. You can't, you know, look up in the yellow pages, confidential informant, and see where they live and how to call them. The government has a unique control over them. And when you're getting conflicting representations that their number one witness is going to be at trial and then is not going to be at trial in a trial brief, that's usually not where you look. Those are usually for legal issues that are going to arise in a trial. And then subsequent to that, you get a couple of more things that say that he's, you know, that he's listed on these amended witness lists. This – I submit that Mr. Wynn and his attorney acted at the first chance they got, acted after the translator testified. This is before Sergeant Morath or anything. That's when Mr. Wynn stood up and said, without this guy, I'm mostly guilty. And, you know, the district court at that point, you know, and at the end of that day, said, you know, I wish the government would bring them. I think they'd agree it's in their interest to bring them. But, you know, the district court at that point, when it's up to them. Kagan. You want to talk about the tapes and the testimonial statements that were first allowed in and then excised, and then the tapes went to the – as I understand it, the tapes, the actual tapes, which were in Vietnamese. Right. Went to the jury room. Absolutely. Well, they were admitted into evidence, so I would assume that they went to the jury room. Right. And they were sent to the jury room.  And there were people on that jury – you say, I don't know where this is supported in the record, at least one who could understand Vietnamese. In the – in jury selection, which actually made it into this transcript, and it is included in the excerpts, there is at least one person on the veneer that did understand Vietnamese. There's no showing there was a video or whatever, but a tape player in the jury room. That's right. There is no evidence about that in this record. What was the point of sending the tapes in if there was no tape player? Well, I would agree. And I would think under the law of the circuit, even if they did – Was the person who understood Vietnamese, was he on the jury? He or she on the jury? We don't know that. We don't know that. That's right. So we don't know that there was anybody who could have listened to these. Right. And meanwhile, the tapes were missing huge chunks. Oh, up to seven minutes. That's right. And, you know, during this period, the only things that were introduced were tapes from March 18th and 19th. However, you know, this investigation and its instigation by the informant we know from Sergeant Maras went on since February. And during that entire time, the informant has recording equipment and isn't recording this entire thing that's happening before. So what we get is this small snapshot. And even then, when we have that snapshot, we see that this person with no criminal record essentially has his will overrun, even though there's this huge period of time. We don't know any of the steps that happened up to then. And that's what he's saying. That's why I want this witness. I want this witness to say that, to complete this record, so that I have my day in court, so that I can show what really happened. Counsel, why don't we hear from the other side? You still have seven and a half minutes to respond. Okay. Thank you. We'll hear from the government. Good morning, Your Honors, and may it please the Court. I'm Assistant United States Attorney Michael Dion. I represent Appali United States, and I was also trial counsel in this case. Your Honor. What do we know about the jury room and the tape player? The record seems to be bare on that. There was no tape player. The tapes were admitted into evidence for one reason and one reason only, as part of the foundation and the chain of custody for the transcripts. We put the case agent on the stand to talk about how the recordings were made. We introduced the physical recordings. That way, when the interpreter testified, he was able to look at the physical recordings and say, yes, these were the tapes. And they were sent to the jury room just because all the exhibits were sent to the jury room? All the evidence goes to the jury room. They're physical exhibits. There is nothing in the record at all to suggest that there was any tape player or any other way to play those, and there was not. And there was no objection. There was no objection to those tapes going back into the jury room by defense counsel, because defense counsel knew that they were just physical evidence and no one was going to listen to them. To go back to the other end, my understanding is that the government, that the confidential informant was listed, Lee, I guess is his name, as witness number one on a series of witness lists, including ones as of the day of trial. Is that right? Absolutely. We kept him on every witness list. But there was also a statement about a week before that you couldn't find him. Right. They started, they were looking for the informant. They weren't able to find him. We put in our trial brief file the week in advance that we can't find the informant and we don't expect that we're going to have him at trial. However, we never knew if we might find him the next day, the hour before trial, and we didn't want to have the defense then jump and say, well, you took him off your witness list. But you don't think the defense was, therefore, entitled to think when he keeps showing up on the witness list that maybe you found him? I don't think so. But first of all, I think that parties in criminal cases understand that you list every witness that you think you might reasonably end up putting on there. And I think if the defense wanted clarification, there's plenty of things they could have done. Call the government, write a letter, contact the witnesses. When was the day? When was the day? The little star saying, it's available. I'm sorry. When was the identity of the confidential informant made known? I don't think there's anything in the record about that. I would estimate that we made disclosures about three weeks before trial. However, remember, as the first witness list, did it say C.I. or did it say? No. I think we named him. On every witness list, I think we named him by name. By name. Okay. In other words, the defense knew who the C.I. was. Yes. Did you provide any discovery on the informant? I don't know. I suspect that we did. I can't say for certain. I believe we provided criminal history. In fact, I'm almost certain that we did provide his criminal history and some related information. Did that include his address? It would not have included his address. Did the defense ask for an opportunity to interview the confidential informant before trial? Did they? Yes. I don't think they ever did. And I should point out that, as Mr. Broberg has mentioned, the defense didn't need to see his name on the witness list. This was somebody that Mr. Winn had had a long relationship with. He knew who the informant was. He knew his name. Well, he knew that that he was a person. He didn't know he was the informant until he was told that. No. He knew because that was the person he'd been dealing with. So he knew who had set him up. That was clear from the papers that were filed in the case. For example, the complaint, the initial charging document, said such and such a person met with Hung Winn on these dates, didn't identify him by name, but Hung Winn knew who he'd been dealing with at all those times. Hung Winn knew who he was supposed to meet on the day of the big drug deal. So it would have been very, very clear to Hung Winn that the informant in the case was Trinh Le, his old acquaintance. And that would have been clear to him from his initial appearance when he would have had the complaint read to him by his attorney. So he would have known that Trinh Le was the informant for a long, long time. Now, his attorney said it was a blessing that they couldn't find him. Are we to make anything of that? Yes. I think that's the reason that his attorney was unable to make any kind of offer of proof about what the informant's testimony would have been. And the law in this case ---- I'm not following you. You mean because there would have been nothing favorable? Right. Right. And there's no excuse here at all for there not to be an offer of proof in support of the motion for a continuance. This circuit clearly requires, it clearly says that you have to say in detail what the expected testimony will be, why it's relevant, why it will be beneficial. So why couldn't Mr. Rowe, the trial counsel, make an offer of proof? After all, if the relevant evidence that they're expecting to get from this informant is what went on between Hung Winn and the informant in these unrecorded meetings and conversations, well, Hung Winn knows what went on. He can tell that to Mr. Rowe, and Mr. Rowe can get up there and make an offer of proof, and he can say here's what he did, here's how he entrapped him, here's what he did wrong. He didn't do anything like that. And, in fact, he said this is a blessing, this is a good thing for the defense because he knew that he couldn't make any kind of offer of proof. And you can take a look. I think it's in the supplemental excerpts of records, pages 59 to 61, the discussion of the motion to continue. There is no offer of proof other than saying my client wants him here, he thinks his testimony would be helpful. That is not an offer of proof. That is not. Ginsburg. At the time of the second motion to fire his lawyer, basically, the judge didn't talk, didn't make any inquiry of Winn himself, especially on the question of threat and whether he wanted to represent himself. He simply went through counsel and said, you know, what's going on, what's the relationship, does he want his own, does he want to represent himself, and he basically listened to whatever the lawyer said. I couldn't quite tell whether Winn was there at the time even. I don't know. Could you tell that? Winn was present. That was the very first thing that happened on the morning of the second day of trial. And Mr. Winn was there for that colloquy with the court. And that doesn't seem the way things were supposed to proceed. I don't know whether it matters or not, but certainly, ordinarily, if there's a question about whether the defendant wants to represent himself, you ask the defendant. You don't ask his lawyer. Well, and I think it's important to look at the context of that conversation. Like I said, this was on the morning of the second day of trial. The question of substitution of counsel had come up twice already on the first day of trial. It came up basically at the same time as the continuance request after the jury was paneled in the direct testimony of the first witness. And Mr. Winn got up and said, I want to fire my lawyer. The court inquired of both Mr. Winn and Mr. Rowe. Mr. Rowe said that, although they have some disagreements about trial tactics, the real problem is he's upset with me that the informant isn't here and he wants to fire me. Judge Kuhnhauer then asked the defendant himself. And he said, is that accurate? And he said, yeah. I wanted the informant here. He's not here, so I want to fire my lawyer. And at that point, Judge Kuhnhauer said, motion for new counsel denied. And I think you can see why, because appointing a new lawyer isn't going to make the informant magically appear. It's not going to solve the problem. Later that day, Judge Kuhnhauer on his own raises the issue again with Mr. Winn. And he says, are you satisfied to go ahead with Mr. Rowe as your lawyer? And Winn says, again, he complains. He wishes the informant was there. And he says, however, the informant's not here. That's how it is. My lawyer is as good as any other. As the Court noted, that was kind of a backhanded compliment, but he certainly did seem to be acknowledging that he was willing to go ahead with his current counsel. Now, then the next morning, when we come in for day two of trial, Hunwin has made a couple of written filings, a renewed motion for new counsel. Kagan. Was it a motion for new counsel or was it a motion to discharge his counsel? I'm sorry? Was it a motion for new counsel or a motion to discharge his counsel? It was a motion for termination of counsel. Right. And the ask of the individual, when the self-representation issue would have arisen for that reason. That's correct. And at that point, the Court read what was in the papers and then went ahead and conducted its inquiry with Mr. Rowe. Mr. Rowe said, it's the same issue that we had yesterday. And the critical thing to me was he said to Mr. Rowe, does Mr. Nguyen want to represent himself? Because he had earlier said, I'm not going to be able to, I'm not going to have a new lawyer. But it might have been different if he was willing to represent himself, because that could have gone on immediately, possibly. And Rowe answers, but he never asks Nguyen. I'm not aware of any case law that requires the Court to specifically inquire personally of defending what his feeling is. When he's trying to fire his lawyer? I'm sorry? When his hope point is that he wants to fire his lawyer. I mean, it's strange to have him speaking through his lawyer when what he's trying to do is fire his lawyer. But at the same time, that is how it works. You do speak through your lawyer as long as your lawyer is appointed. And there was ample evidence. I mean, time and time again, Mr. Rowe got up and put Mr. Nguyen's position on things on the record. He said Mr. Nguyen doesn't like that I'm doing this. He doesn't like that I'm doing that. He wants to fire me. He's not happy with me. One of our standards, at least on substitution of counsel, is a proper inquiry. And I've always understood that to mean of the defendant, not of the lawyer. Well, actually, this Court has held, and I cite the case in our brief, that it is not absolutely required, it is not fatal error to conduct no inquiry of the defendant at all. What's required is that the Court, through whatever source, has sufficient information to reach an informed decision. And that actually comes from, I believe, the Smith case, United States v. Smith, 282 F. 3rd, 758, 2002 case, where this Court has held that the mere fact that the Court doesn't specifically inquire of the defendant is not automatically fatal error. You look to whether the Court had sufficient information to reach a decision. And I think after having talked a couple of times already about the request for new counsel with both Nguyen and Mr. Rowe, having heard that Mr. Rowe is still communicating with Nguyen, he still knows what issues are important to Nguyen and what their disagreements are, I think the Court was entitled to rely on Mr. Rowe's statement that he had talked to Nguyen, and Nguyen was very clear that he was not looking to represent himself, pro se. And again — And one other question that might be worth addressing is this confusion about who Nguyen was acting for and whether that matters. As I understand the argument, it's that he really couldn't have been part of the sales conspiracy because he was really an agent for the buyer, and that he couldn't — as an agent for the buyer, he couldn't be in conspiracy with the buyer because the buyer was a government agent. Does that make any difference, I guess, that he was in this kind of dual role, at least a dual role, and possibly a sole role as the agent of the buyer? I don't think it makes any difference. First of all, let's talk about these cases that the defense cites, talking about buyer's agents. We have two cases from the 1950s, from I think the Third and Fifth Circuits. Those cases didn't involve conspiracies. In those cases, the defendants were charged with being sellers, with actually selling the drugs to the ultimate customer, who was in both cases a government informant or an actual government undercover agent. Those cases didn't involve charges of aiding and abetting the possession of drugs with intent to distribute, only the actual crime of sale. Now, if you look at the facts of those cases, they're actually comical. Basically what you have in both those cases is an informant who, according to the court, pretends to be a drug addict who is in the middle of withdrawals and is in terrible pain. And he accosts this poor guy on the street, and he says, Please, please, please, here's $20. Find somebody. Get me some drugs. I'm in terrible pain. And the defendant, just out of the goodness of their hearts, then goes and finds somebody to get some heroin. There's nothing in it for them. They get the $20. They bring it back, and they give it to the informant. And then they're charged with selling drugs. And the court said in both those cases, This person is not selling drugs. They are just a procuring agent for the buyer. Those cases are light years away from this case. First of all, we have different charges, conspiracy and aiding and abetting. So the legal analysis is completely different. Second, the facts are completely different. Hung Nguyen was deeply and profoundly involved in this conspiracy. He went to great lengths to make this drug deal happen. Counsel for Appellant has cited some things in the transcripts where he says, Let's not do this. I don't want to do this. The transcripts are in Appellant's excerpts of record. They're about 25 pages long. I defy anybody to read those transcripts and come away thinking that Hung Nguyen did not want this drug deal to happen. The times when he says things like, Hey, let's not do this, forget about this, are when he's angry at the informant because the informant isn't doing the deal the way Hung Nguyen is telling him it has to happen. Hung Nguyen isn't just an advocate for the informant. He is part of that. He is, as Your Honor said, he's a mailman. He's representing the informant when he's dealing with the sellers. When he deals with the informant, he's representing the sellers. His goal is to make this deal happen. And when he's talking to the informant, there's this running dispute about where the drug deal is going to happen. The informant wanted to do it in a hotel or some neutral location because the DEA thought that would be the safest thing. Hung Nguyen says no. It has to happen at their apartment. And he's talking about the apartment of Bai Li where actually Hung Nguyen and the other conspirators pretty much hang out for most of the day of the big drug deal. And the argument goes on and on. And the informant resists as much as he can, and Hung Nguyen says no. And sometimes Hung Nguyen gets angry. And he says, Well, if you don't trust me, then let's just call this thing off. It's not because he doesn't want to do the deal. He's being petulant. He's bluffing. He's pushing the informant as much as he can. But he kept on it. The dispute goes on through several transcripts. And eventually the informant caves and really it was the DEA that caved and said, All right, we'll do it over at your place. This is not how you would act if you were merely a procuring agent for somebody. Hung Nguyen is conspiring, not with the informant. Nobody ever alleged that. There was never any suggestion of that by the government. He's conspiring with the other people on the source side of the deal, Bai Li, Duck Van Bu, and Xuan Nguyen. And another thing that's really interesting is Hung Nguyen's behavior when this drug deal is supposed to happen. First of all, he spends most of that day hanging out at Bai Li's apartment, conferring regularly with Bai Li and the other conspirators, trying to make the thing happen. Mr. Broberg said that Bai Li and the other conspirators did not let Hung Nguyen near the drugs. I think he actually said that they did not let Hung Nguyen touch the drugs. That is absolutely and unquestionably refuted by the evidence. Hung Nguyen's fingerprints were found on the drug packaging for the eight kilograms of cocaine. Xuan Van Nguyen, the cooperating informant, explained how they got there. He said that when the drugs arrived in Bai Li's apartment, Hung Nguyen was in there and Hung Nguyen took the kilos. There were eight of them packaged in one kilogram bricks. He cut each one open with a knife. He checked the cocaine with his fingers. Then he taped them back up and they went back into a backpack and they went back out into a van that was sitting in the parking lot. And the way the drug deal was supposed to happen was that the drugs would sit there in the parking lot in that unlocked van. Again, about 1.5 million street value in cocaine. And the informant was going to come. He was going to inspect the drugs by going alone into that van. And if he was okay with them, then they'd proceed to consummate the transaction. The informant would pay them and they'd turn over the drugs to him. So where is Hung Nguyen when the informant is supposed to show up and inspect these drugs? He's up on a balcony with Duc Van Vu and Bai Li watching the parking lot with a good view of that van, waiting for the informant to show up, watching when the informant shows up and goes into the van, watching over the drugs that are worth so much money. That's a weird place for him to be if he's just a procuring agent for the informant. Why isn't he down there with the informant checking out the drugs? Because he's allied with both parties in this transaction. And whether he viewed himself as particularly tied to the informant or Bai Li is completely irrelevant. What matters is that he was working with Bai Li and Xuan Nguyen and Duc Van Vu to accomplish a common goal. They had a common plan. They wanted these 8 kilograms to be sold. They wanted them to be distributed to the informant. And that is the essence of a conspiracy charge. Counsel, I think you've made your point. Anything further? Your Honor, unless any of you have any questions, that's all I have. No further questions. Thank you very much. Mr. Broberg, you've had some reserved time. I just have a couple points in response. As to the issue about the tapes, this is probably a moot point, but what are you supposed to do? You object when these tapes come into evidence. You object to the tapes. You object to the transcripts. You object on about three or four different grounds. You are going to assume they're going to the jury room. Do you need a specific objection? I object that the tapes are going to the jury room. I certainly don't. Well, what's the prejudice at this point? If they couldn't have been heard? No. I'm with you, and that's why I began that it may be a moot point. Okay. All right. Let's not resolve that on there wasn't any objection as the government suggested. That's all I'm saying. All right. I would also like to point out the government also said that when your lawyer is appointed, your lawyer does this. This lawyer was retained. Let's just be clear about that. I cover in a footnote in my brief kind of a difference in the law between the two. The government also mentioned aiding and abetting. The problem with that charge is the government at pages 26 to 27 of their brief sets forth the elements of aiding and abetting possession with intent to distribute cocaine. And the second element is that your, I believe it's commanding, inducing, procuring, or this causes possession with intent to distribute to be committed by someone else. Could you address, please, and I think I asked you this before, but we didn't get to play as much on it, the testimonial statements that were on the tapes and that you, as I understand it, you asked to have rejected originally. They were not rejected originally, and then later you went back over them and rejected them. Absolutely. So you can't unring the bell situation. I mean, this is the central evidence about Mr. Wynn are these tapes and these things that are being said. There is a way to view them. I absolutely disagree with the government that they're so inculpatory. I think there is a way to view them as exculpatory because of some of the statements that are on them that I've pointed out. However, to your question, Your Honor, you know, here you have these admitted. They're such a central part of the case as to Mr. Wynn because Juan Wynn, the only testifying co-conspirator, doesn't know him. So here they are. And then you go through this trial, and the judge is like, all that you heard disregarded. Right. But it would be helpful to me to know what specifically was in that group of statements that were later rejected that's harmful. Well, I'm sorry. That is harmful? Yes. In a harmless error sort of analysis. I mean, first of all, there was an instruction and so on. But even leaving that aside, what was the the what specific statements could have influenced the jury that were originally let in and then were extracted? The jury, I'm going to have to go at your question backwards. The jury sent a jury note out wanting to know about the admission of Exhibit 4B, which was one of the transcripts. Wanted to know the testimony about the admission and the testimony, the reading back and forth. I can get the exact record cited for you. But they wanted to see that. And so, therefore, what is harmful about this is that the government gets one picture. Then the picture changes. So then, therefore, how is a person supposed to be on notice and defend against the moving goalposts? And that is what's harmful about it, Your Honor. There's no particular statement that would have made a difference. I'm sorry? The statements themselves didn't matter. The statements mattered because they weren't subject to cross-examination. They weren't subject to putting more context so that the jury could see that, so that the defendant had a right to present a defense. It doesn't seem I've answered your question. No, you answered my question, but not in terms of any particular statement that, had there been cross-examination, something else might have come out. Well, yes. The only statements I remember was something to the effect of seeing some people down there or ---- Seeing something and things about the parking lot in that kind of nature, yes. And that was relevant to? Well, it's relevant to him being there. I remember the government just told you all about, you know, what they've termed counter-surveillance. That sort of thing certainly would be harmful. I mean, their support ---- they're saying that these aiding and abetting charges or that the aiding and abetting possession of drugs, of the cocaine, is supported by counter-surveillance. That's about the parking lot. That's about the place. That's about those statements. Anything further, counsel?  And thank you very much for listening. And again, I'm very sorry. Not to worry. Thank you, counsel. The case that has just been argued will be submitted for decision. And the Court ----
judges: O'scannlain, Tashima, Berzon